**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CATHERINE COPELLO and ANNETTE ALLEN, on behalf of themselves and other Plaintiffs similarly situated, | ) ) ) | Case No. 10-cv-7396 |
| | ) | Judge Gary Feinerman |
| Plaintiffs, | ) ) | **PLAINTIFFS' REPLY IN** |
| v. | ) ) | **SUPPORT OF PLAINTIFFS'** **MOTION FOR COLLECTIVE** |
| BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) | **ACTION CERTIFICATION** |
| | ) | |
| Defendant. | ) | |

# TABLE OF CONTENTS

I.    **INTRODUCTION**...................................................................................................... 1

II.   **PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF FACTS** ........................ 2

    1.    PSRs Follow the Same Practices with Respect to Targeting Physicians. ................................ 2

    2.    PSRs Have the Same General Practices with Respect to Route Plans. .................................... 4

    3.    PSRs Are Required to Follow BI's Rules and Regulations When Detailing Physicians. ........ 5

    4.    PSRs Are Required to Follow Boehringer's Rules and Regulations for Sample Distribution. 5

    5.    PSRs Have the Same Core Job Duties When Visiting All Types of Targeted Physicians. ....... 6

    6.    PSRs Have the Same Practices with Respect to Obtaining Commitments. ............................ 7

    7.    All PSRs Are Required to Facilitate Speaker Programs and Meals With Physicians According to Boehringer's Rules.................................................................................................. 8

III.   **ARGUMENT** .......................................................................................................... 9

  A.   Collective Action Certification is Appropriate Under Any Applicable Standard: The Precise Nature of Plaintiffs' Burden Is Irrelevant ...................................................................... 9

  B.   Even Under a Heightened Standard, Plaintiffs Only Need to Demonstrate Similar, Not Identical, Job Duties and Legal Claims .................................................................................. 9

  C.   Plaintiff Copello Can Represent the Proposed Collective Action. ............................... 11

    1.    The Plain Language of the Waiver Does Not Preclude Participation in a FLSA Collective Action.......................................................................................................................... 11

        a.    The Defendant's Expansive Interpretation Should Be Rejected Because the Release Does Not Waive FLSA Claims. ................................................................................ 12

    2.    The Waiver Is Procedurally and Substantively Unconscionable........................................... 13

        a.    The "Class Action" Language is Obscure and Buried Within the Release ....................... 13

        b.    The "Class Action" Language Violates Public Policy.......................................................... 14

  D.   Plaintiff Allen Can Represent the Class........................................................................... 15

    1.    Allen's FLSA claim is timely................................................................................................. 15

    2.    Allen should be permitted to pursue an FLSA claim in this action....................................... 17

  E.   Defendant's Administrative Exemption Defense Can Be Tried on a Collective Basis. ............... 19

F.    Plaintiffs and the Opt-in Participants Are Similarly Situated With Respect to their Status Under the FLSA. ................................................................................................................................ 20

    1.    Legal Questions Pertaining to the PSRs' Status Under the FLSA Are Common to the Class. 20

    2.    All PSRs Are Compensated on a Salary Basis of at Least $455 per Week. .......................... 21

    3.    All PSRs Share a Common Primary Job Duty. ................................................................... 21

G.    Plaintiffs' Proposed Notice Is Proper ......................................................................... 22

H.    Equitable Tolling Is Warranted .................................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Adams v. Inter-Con Sec. Systems, Inc.*, 242 F.R.D. 530 (N.D. Cal. 2007) ......................................... 24, 25

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960) ................................................................. 11

*Ayers v. SGS Control Services, Inc.*, 2007 WL 646326 (S.D.N.Y. Feb. 27, 2007) ........................... 10, 11

*Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728 (1981) ............................................... 15

*Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217 (2nd Cir. 2002) .................................... 11

*Bothell v. Phase Metrics*, 299 F.3d 1120 (9th Cir. 2002) ....................................................... 11

*Boyd v. Jupiter Aluminum Corp.*, No. 2:05-CV-227PPSAPR, 2006 WL 1518987 (N.D. Ind. May 31, 2006) ........................................................................................................ 24

*Bradford v. BedBath & Beyond, Inc.*, 184 F. Supp.2d 1342 (N.D. Ga. 2002) .............................. 20, 22

*Brown v. Soh*, 909 A.2d 43 (Conn. 2006) ........................................................................ 16

*Burnett v. New York Cent. Railroad Co.*, 380 U.S. 424 (1965) ................................................ 17

*Calvert Fire Ins. Co. v. Am. Mut. Reinsurance Co.*, 600 F.2d 1228 (7th Cir. 1979) ...................... 18

*Carlson v. Leprino Foods Co.*, No. 1:05-W-798 2006 WL 2375046 (W.D. Mich. Aug. 15, 2006) ........ 24

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) .............................................. 16

*Carona v. Illinois C.G.R. Co.*, 561 N.E. 2d 239 (5th Dist. Ill. App. 1990) ................................... 13

*Chapman v. Lehman Brothers, Inc.*, 279 F.Supp.2d 1286 (S.D. Fla. 2003) .................................. 13

*Church v. Consolidated Freightways, Inc.*, 137 F.R.D. 294 (N.D. Cal. 1991) ................................ 13

*Connecticut Ins. Guar. Assoc. v. Drown*, 2010 Conn. Super. LEXIS 2551 (October 14, 2010) ............. 14

*Evancho v. Sanofi-Aventis, U.S., Inc.*, 2007 WL 4546100 (Dec. 19, 2007, D. N.J.) .......................... 21

*Gentry v. Superior Court*, 165 P.3d 556 (Cal. 2008) ......................................................... 15, 16

*Gieseke v. First Horizon Home Loan Corp.*, 2006 WL 2919076 (D. Kan. Oct. 11, 2006) ................... 24

*Grayson v. K Mart Corp.*, 79 F.3d 1086 (11th Cir.1996) ...................................................... 10

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..................................................... 11

*Holt v. Rite Aid Corp.* 333 F. Supp. 2d 1265 (M.D. Ala. 2004) ............................................... 21

In re *Delta Air* Lines, 310 F.3d 953 (6th Cir. 2002) ........................................................... 22

*In re Novartis Wage and Hour Litigation*, 611 F.3d 141 (2d Cir. 2010) ................................... 24

*International Miners & Chemical Corp. v. Liberty Mut. Ins. Co.*, 522 N.E.2d 758 (1st Dist. Ill. App. 1988) ................................................................................................................................. 14

*Libront v. Columbus McKinnon Corp.*, 1984 U.S. Dist. LEXIS 21259 (W.D.N.Y. Dec. 13, 1984) ........ 25

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) ................................................................ 17

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir., 2008) ..................................... 10, 20, 23

*Moss v. Crawford & Co.,* 201 F.R.D. 398 (W.D. Pa. 2000) ......................................................... 10, 11, 20

*Muhammad v. County Bank of Rehoboth Beach*, 912 A.2d 88 (N.J. 2006) ............................................ 16

*Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620 (5th Cir. 1999) ................................................ 16

*Nerland v. Caribou Coffee Co., Inc.*, 564 F.Supp.2d 1010 (D. Minn. 2007) ......................................... 11

*Pfizer Inc. v. Apotex Inc.*, 640 F.Supp.2d 1006 (N.D. Ill. 2009) ............................................... 18, 19

*Pfohl v. Farmers Ins. Group*, 2004 WL 554834 (Mar. 1, 2004, C.D. Cal.) ............................................ 21

*Posposi v. Gamestop, Inc.*, 2010 U.S. Dist. LEXIS 1819 (D. Conn. January 11, 2010) ........................ 13

*Ridge Gold Standard Liquors v. Joseph E. Seagram*, 572 F. Supp. 1210 (N.D. Ill. 1983) ..................... 18

*Rodolico v. Unisys Corp.,* 199 F.R.D. 468 (E.D.N.Y. 2001) ........................................................... 10

*Roman v. Korson*, 152 F.R.D. 101 (W.D. Mich. 1993) ................................................................... 22

*Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, Case No. 06-cv-1985, Rulings on Defendants Motion to Dismiss Plaintiffs' Rule 23 Class Allegations and Plaintiffs' Motion for Conditional Certification ......................................................................................................... 2, 18

*Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 585 F. Supp. 2d 254 (D. Conn. 2008) .. 3, 7, 8, 9

*Scott v. Aetna Services, Inc.*, 210 F.R.D. 261 (D. Conn. 2002) ..................................................... 20, 23

*Serlin v. Arthur Andersen & Co.*, 3 F.3d 221 (7th Cir. 1993) ..................................................... 18

*Sparveri v. Town of Rocky Hill*, 656 F.Supp.2d 297 (D. Conn. 2009) .............................................. 12

*Taylor v. Progress Energy, Inc.*, 493 F.3d 454 (4th Cir. 2007) ..................................................... 15

*Thiebes v. Wal-Mart Stores, Inc.*, No. 98-802-KI, 1999 WL 1081357 (D. Or. Dec. 1, 1999) .................. 1

*Thiessen v. General Electric Captial Corp.*, 267 F.3d 1095 (10th Cir. 2001) ........................................ 11

*Torres v. Gristede's Op. Corp.*, 2006 WL 2819730 (Sept. 29, 2006, S.D.N.Y.) ..................................... 11

*Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161 (Apr. 22, 2008, S.D. Cal.) ................................ 21

*United States v. Kubrick*, 444 U.S. 111 (1979)........................................................................ 17

**Statutes**

28 U.S.C. § 1332(d) ................................................................................................................... 19

29 U.S.C. § 216(b) ................................................................................................. 10, 12, 13, 15

29 U.S.C. §213(a)(1) ................................................................................................................. 22

29 U.S.C. §255(a) ...................................................................................................................... 17

820 ILCS 105/12(a) ................................................................................................................... 19

Federal Rule of Civil Procedure 23(b)(3) ................................................................................. 10

**Regulations**

29 C.F.R. § 541.200 ............................................................................................................ 22, 23

29 C.F.R. § 541.700(a) ............................................................................................................... 23

# I.    INTRODUCTION

Plaintiffs' motion for preliminary certification and *Hoffman-LaRoche* notice should be granted because Plaintiffs and the proposed collective action members – all of whom are or were Pharmaceutical Sales Representatives ("PSRs") for Boehringer with the primary job duty of presenting information about Boehringer's products to a Boehringer-targeted list of physicians in face-to-face meetings – are similarly situated with respect to their entitlement to overtime compensation under the Fair Labor Standards Act ("FLSA").  The evidence presented by Plaintiffs–consisting of sixteen PSR depositions, the testimony of Boehringer's Rule 30(b)(6) designees from the *Ruggeri* case, and numerous documents–shows that PSRs perform the same primary job duty, pursuant to the same sets of policies and procedures and Boehringer-approved methods.[1]  All PSRs have nearly identical job descriptions, receive uniform training, work within the same supervision structure, and are subject to performance evaluations under uniform metrics.  Boehringer's internal practices are consistent with these facts:  the company treats all PSRs as exempt from overtime under the FLSA based exclusively on uniform job descriptions.  Accordingly, there is a "factual nexus which binds [the collective action members] together as victims of an alleged policy or practice" to classify them as exempt from the FLSA's overtime requirements in violation of the law.  *See Thiebes v. Wal-Mart Stores, Inc.*, No. 98-802-KI, 1999 WL 1081357, *2 (D. Or. Dec. 1, 1999).

Defendant's arguments to the contrary are unavailing because they rest on incorrect legal premises.  First, there is no merit to Defendant's argument that the Plaintiffs cannot represent the proposed class.  Ms. Copello's so-called "waiver" is void as a matter of law and not what Defendant claims it to be. With respect to Ms. Allen: her claim is timely because it was tolled effective November 12, 2008, and the Court has discretion to allow Ms. Allen to pursue her FLSA and state law claims in a single action in order to facilitate the efficient litigation of her claims.

---

[1] All references to exhibits, testimony and documents cited herein refer to exhibits filed as attachments to the Declaration of James P. Keenley in Support of Plaintiff's Motion (Doc 42-3) ("Keenley Dec.").  Since the parties were able to reach a stipulation as to the use of *Ruggeri* evidence in this action, Plaintiffs will file confidential documents referenced therein under seal.

With regard to the merits of Plaintiffs' motion, Defendant's arguments are unpersuasive. First, the evidence shows that the core job duties that will determine whether Boehringer's PSRs are properly classified as exempt are nearly identical. As the *Ruggeri* court has already found, there is no merit to Defendant's contention that the administrative exemption defense at issue in the case requires unmanageable, individualized mini-trials for each opt-in plaintiff. *Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, Case No. 06-cv-1985, Rulings on Defendants Motion to Dismiss Plaintiffs' Rule 23 Class Allegations and Plaintiffs' Motion for Conditional Certification (hereinafter "*Ruggeri I*").[2] Second, Defendant does not rebut the evidence that all the PSRs perform the same core job duties. Even taking Defendant's factual contentions at face value, they do not undermine the overwhelming evidence submitted in support of Plaintiffs' motion showing that PSRs perform the same core job duties, pursuant to the same rules, policies, and supervision. Minute differences between employees – such as the medical specialty of the doctors between two different PSRs' lists of mandatory targets or how they schedule their routes -- do not defeat collective action treatment.

## II. PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

Defendant does not actually dispute that all PSRs perform the same core job duties – the relevant factor in the FLSA exemption analysis. Nor could it: Plaintiffs' factual claims are supported by hundreds of citations to testimony and documents from the *Ruggeri* case and the factual findings of the *Ruggeri* court. *See* Plaintiff's Memorandum (Doc. 42) ("Pltfs.' Mem.") at 3-14. Instead, Defendant at best identifies insignificant variations in the manner in which individual PSRs execute day-to-day tasks. *See* Def.'s Opp. At 3-20. This showing, even taken at face value, does not defeat Plaintiffs' motion.

### 1. PSRs Follow the Same Practices with Respect to Targeting Physicians.

The evidence demonstrates, and Defendant concedes, that Boehringer provides PSRs with a list of targets that the PSRs are expected to call on, that PSRs are not allowed to add or remove targets without management approval, and that PSRs are evaluated based on their success reaching the doctors on their target list the number of times their target list tells them to do so. *Ruggeri v. Boehringer*, 585 F. Supp. 2d 254, 258-59 (D. Conn. 2008) ("*Ruggeri II*");

---

[2] The *Ruggeri* court's preliminary certification order is attached as Exhibit 1 to the Keenley Declaration.

Def.'s Opp. at 4.[3] Boehringer provides each PSR with a target list that contains not only each targeted physician, but also the number of times each physician must be contacted, which products the PSR must promote to the physician, the order in which those products must be promoted, and the relative priority of the physicians on the list. *Ruggeri II*, 585 F. Supp. 2d at 258-59.[4] PSRs did not create their own target lists; nor were they even consulted on whether the priorities identified in the lists made sense based on their experiences in the field.[5] Defendant asserts that PSRs have different numbers of targets on their target list, but the evidence shows that this is a fairly narrow range.[6]

Boehringer notes that while some PSRs do not make a practice of suggesting new target doctors, others were more active in suggesting targets. Def.'s Opp. at 4-6. This does not demonstrate that PSRs had different job duties, but instead that all PSRs had the same scope of limited authority: they could *suggest* that targets be removed or added, and these suggestions were subject to management approval.[7] A PSR's ability to successfully suggest the removal of a physician was generally limited to situations where the physician died, retired, or moved out of

---

[3] *See e.g.*, Hoffmann Dep. 85:5-87:4; Carver Dep. 128:9-20. Deposition testimony excerpts cited herein are attached as exhibits to the previously filed Keenley Declaration (Doc. 42-3).

[4] *See, e.g.*, McKenzie Dep. 17:19-18:7 ("[T]he call plan is basically what is required by the company when it comes to the number of times you must detail a doctor, and the frequency in which you must do that and also the products you're supposed to speak to them about and the order of the product that [you're] supposed to speak to them about."); Purnell Dep. 150:17-152:10 (describing priority listings from Boehringer); Hoffmann Dep. 117:3-119:4 (describing adherence to Boehringer's priorities);

[5] *See, e.g.*, Hoffmann Dep. 117:3-119:4; Stallone Dep. 158:16-159:6; Carver Dep. 46:1-9 (call plan "very clearly delineated, you know, who the physician was, how many visits we wanted to get in front of him").

[6] The testimony of the opt-in plaintiffs shows that the number of targets ranged from approximately seventy to between two and three hundred. Summers Dep. 32:2-6 (80); Ha Dep. 26:19-21 (70); Stallone 42:4-6 (150); Kliem 30:7-10 (200-300) Defendant's claim that opt-in participant Rodriguez had "far more than 700 targets" is incorrect, as Ms. Rodriguez was plainly answering the question "How many doctors were in your territory?" Rodriguez Dep. at 46:17-18. Because Boehringer gives PSRs a specific list of *targeted* physicians to contact, their target lists necessarily contain far fewer physicians than practice in the entire territory.

[7] *See, e.g.*, *Rugerri*, 558 F. Supp. 2d at 259; Rodriguez Dep. 47:20-48:9; Kliem Dep. 34:10-19; Katz Dep. 68:6-12; ; Ramirez Dep. 123:10-21; Summers Dep. 49:4-23.

the territory.[8]  The PSRs' core duty is to call on the physicians on their target list, and this is how PSRs spent nearly all their time.

### 2. PSRs Have the Same General Practices with Respect to Route Plans.

Defendant does not dispute that PSRs use route plans to structure their work activity and that these route plans were based largely on geographic common sense and when a physician made herself available for PSR visits.[9]  Defendant's allegation is that some PSRs adhered to the route plans less strictly than others.   Def.'s Opp. at 7.   Nonetheless, using route plans is a job duty common to all PSRs.[10]  The fact that some PSRs were more strict than others with regard to actually adhering to the route plan on a day-to-day basis is only evidence that all PSRs had the

---

[8] *See, e.g.,* Katz Dep. 52:18-53:24 (Asked for the reasons for removing a target from her target list, Ms. Katz responded: "[s]o moving, dying, or not practicing HIV.  That's what I can think of"); Rodriguez Dep. 47:20-48:9 ("Generally the only changes we could make to what they deemed was an important physician for us, was a death, or not even a move to another territory, because if the doctor moved to another territory, sometimes they didn't accept that as a change."); Purnell Dep. 45:15-21 (could get a doctor removed from target list if  "They moved from the territory.  They're no longer practicing.  They died.  Or there's absolutely no access at all.").

[9] Def.'s Opp. at 7 ("PSRs follow route plans that they organize by day, week, or several weeks."). Defendant's claim that Ms. Purnell testified that her route plan factored in prescribing potential is not accurate.  Ms. Purnell's testimony shows that she used her route plan much like all the other PSRs – to ensure that she saw her targets as often as possible, in order to meet the reach and frequency requirements imposed by Boehringer.  Purnell Dep. at 37:11-40:4.  She also testified that the schedule was largely the product of the days and times physicians were available to see PSRs, which was something dictated by the physicians themselves.  *Id.*

[10] Summers Dep. 27-19-28:1; Ramirez Dep. 22:22-23:12; Stallone Dep. 28:6-11 (routing plan was "basically just in place. I don't even know who designed it."); Purnell Dep. 28:5-10 (the "routing [plan] specifies where each person is suppose[d] to go on certain days and who they're suppose[d] to see"); Ha Dep. 25:8-26:8 (routing plan dictated by manager); Katz Dep. 157:2-16 (routing plan covering large territory); Kliem Dep. 30:20-23; Smith Dep. 137:7-18 (routing plan received from more experienced employees); D'Amato Dep. 36:5-10;  Rodriguez 55:25-56:10 (routing plan based on geography and physician availability); Hoffmann Dep. 48:9-12.

same general scope of authority with regard to how they used their route plans – following the route plan was a means to an end:  detailing targeted physicians.

### 3. PSRs Are Required to Follow BI's Rules and Regulations When Detailing Physicians.

Defendant does not seriously contest the evidence showing that all PSRs were required to adhere to the core message for each product, exclusively used Boehringer-supplied methods and materials to do so, and targeted doctors at the frequency required by their target planners. Defendant's evidentiary showings merely demonstrate the unsurprising idea that PSRs use professional skills while detailing.  Def.'s Opp. at 8-11.  This showing does not defeat Plaintiffs' motion but instead shows PSRs had the same or similar range of authority to adapt their presentations so long as they adhered to the core message and approved materials.  *See supra* n.10.  Further, Defendant's characterization of PSR detailing practices is not borne out by the testimony.[11]  PSRs clarified that they do not deviate from the core message, and any "tailoring" of their presentations is limited to determining where in the Boehringer-dictated presentation cycle a particular physician is so that the PSRs or their team counterparts can resume the presentation at the appropriate place in the presentation cycle on the next visit to the physician in question.[12]

### 4. PSRs Are Required to Follow Boehringer's Rules and Regulations for Sample Distribution.

The evidence demonstrates that Boehringer required nearly all PSRs to provide physicians with samples of Boehringer's products and that Boehringer required each PSR to

---

[11] In numerous instances, Plaintiffs disagree with Defendant's representations as to the deposition testimony.  For the Court's convenience, a chart compiling the more problematic of Defendant's representations regarding the deposition testimony and contrasting those representations with the full relevant deposition testimony is attached as Exhibit 26 to the Keenley Declaration.

[12] Summers Dep. 72:5015; 73:12-74:5 (testifying that "in training, you are kind of given a flow chart of how each call should progress, so you try to pick up on it, just a continuation of a call," and the notes he shared with PSR counterparts were used in order to "remember what [they] had spoken about" and to "pick up on the last call of [their] counterpart." ); Purnell Dep. 150:9-13 (testifying that she does not ever deviate from the core message and that she follows the same structure in every presentation that she was taught by Boehringer to follow).

account for every sample by complying with strict and uniform guidelines for the handling of those samples. *Ruggeri*, 585 F. Supp. 2d at 259, *see also* Pltfs.' Mem. at 8-10. Defendant, without disputing that distributing samples is a core PSR job duty or that all PSRs are expected to comply with the sample accountability procedures, alleges that some PSRs left varying *amounts* of samples with doctors.[13] That they did so is not material to the exemption defenses at stake in this case.

### 5. PSRs Have the Same Core Job Duties When Visiting All Types of Targeted Physicians.

There are two main types of PSR in the proposed collective action: those with the job title Primary Care Sales Representative and those with the title Specialty Sales Representative.[14] Defendant correctly observes that Specialty Sales Representatives typically were responsible for specialist physician targets, like urologists, while Primary Care Representatives typically were responsible for general practitioners. Def.'s Opp. at 11-13. The evidence also shows, however, that these two positions are different only in this irrelevant respect because the job duties – presenting information to targeted physicians from Boehringer approved materials – are the same. *See supra* nn.3-10. Defendant offers no evidence to the contrary.

Likewise, the facts do not support Defendant's argument that detail work carried out at a hospital is different. The evidence demonstrates that PSR hospital duties were the same as the rest of their work activity: face-to-face detail calls with physicians who happened to be in

---

[13] *Compare* Def.'s Opp. at 11 *with* Pltf.'s Mem. at 8-10. A small subset of PSRs – HIV Representatives – did not sample as part of their core job duties because Boehringer does not distribute samples of its HIV products. Katz Dep. 125:17-24. This minor difference between HIV Representatives and other categories of PSRs does not render the HIV Representative dissimilarly situated as these PSRs still performed the same core job duty of promoting Boehringer's products to a targeted list of physicians. Katz Dep. 75:4-15; 75:16-76:2,134:25-135:8.

[14] *Compare* Def.'s Opp. at 3 (2800 PSRs employed at Boehringer) *with* Conklin Dep. 32:20-25 (approximately 2000 Primary Care Representatives), *and* 33:20-22 (approximately 600 Specialty Sales Representatives).

hospitals.[15]  Finally, with regard to pharmacies, it is true, as the *Ruggeri* court noted on summary judgment, that PSRs sometimes called on pharmacies.  *Ruggeri II*, 585 F. Supp. 2d at 260.  But, it is also clear that this work consisted of the same essential task–delivering approved information about Boehringer's products–and that it is a responsibility shared by all PSRs.[16]  Accordingly, PSR job duties with respect to hospitals and pharmacies also support a finding that they are similarly situated to each other.

### 6. PSRs Have the Same Practices with Respect to Obtaining Commitments.

Defendant's assertion that all PSRs are encouraged to get some kind of non-binding statement from a doctor that the doctor will consider using Boehringer's pharmaceutical products simply highlights another level of common job duties.  That PSRs characterize these interactions as either a hard or soft "sell" is immaterial.  The essential fact for purposes of this motion is that Boehringer requires that all PSRs attempt to obtain "commitments."  The evidence demonstrates that all PSRs are trained on Boehringer's presentation method which includes, as the final step, an effort to obtain a commitment from the physician to consider prescribing Boehringer's products.[17]  The evidence also demonstrates that attempting to obtain commitments was a shared

---

[15] Summers Dep. 72:5-18 (PSR who detailed at hospitals testifies that the detailing process with physicians in hospitals is identical to the detailing process with physicians in private practice); Ha Dep. 73:12-19 ("Q. And are hospital visits any different than visiting physicians at their offices?  A. Nope.").

[16] *See, e.g.*, Stallone Dep. 71:3-72:13; Hoffmann Dep. 34:10-35:4.

[17] *See, e.g.*, Purnell Dep.154:2-21 (follows uniform presentation format: "I'm wondering when you go in to present to a physician, though, does your core presentation remain the same? Do you follow the same structure that you were taught by Boehringer to follow?  A: Yes. . . . A basic call consists of opener, feature and benefits, fair and balanced, which would be your side effects, dosing and then smart questions."); Rodriguez Dep. 69:15-70:2  (describing uniform sales model).  Of course, as the Court has already found, this "commitment," even when successfully obtained, is in no way a legal commitment to use or purchase Boehringer's products.  It is, at best, a non-binding verbal commitment by the physician to consider prescribing a Boehringer product if and when an appropriate patient presents.  Such commitments are not sales or transactions of pharmaceutical products.  *See generally*, *Ruggeri*, 585 F. Supp. 2d at 266-72.

factor in PSR performance reviews.[18]  Defendant does not dispute this, but points to slight variations in individual practice as to how aggressively these non-binding commitments were sought.  Def.'s Opp. 16-17.

### 7.  All PSRs Are Required to Facilitate Speaker Programs and Meals With Physicians According to Boehringer's Rules.

Defendant does not dispute that all PSRs were required to set up meals and speakers for physicians.[19]  Instead, Defendant alleges that PSRs are not similarly situated because of different preferences individual PSRs had for types of speakers (local vs. national) or types of meals (dinners vs. breakfasts).  Def.'s Opp. at 17.  The evidence shows that PSRs had similar duties and responsibilities with respect to their promotional budgets and the organization of speaker programs.  All PSRs had a promotional budget that they were expected to use to obtain access to physicians, primarily via gastronomic needs: breakfasts, lunches, dinners, and so forth.[20]  That some PSRs preferred to spend the money on dinners and lunches instead of baked goods and breakfasts is of no consequence to their individual status under the FLSA and does not render them dissimilarly situated.  All PSRs also were responsible for organizing speaker programs by choosing the speaker from a list of Boehringer-approved speakers, arranging the logistical details of the program, and inviting target physicians to the presentation.[21]

---

[18] *See, e.g.*, Keenley Dec., ¶28, Exh. 27 at D036830 (field contact report listing "Asking for Business / Closing" as core competency and praising employee for getting "commitment" on a product).

[19] *Compare* Def.'s Opp. at 16-19 *with Ruggeri II*, 585 F. Supp. 2d at 259.

[20] *See* Pltf.s' Mem. at n.6.  Plaintiffs dispute the actual extent of PSR authority with respect to their budgets.  The evidence shows that all PSRs are required to utilize all or nearly all of a set amount of money on promotional activities like buying lunch and dinner for targeted physicians, and were not rewarded for spending less than the amount budgeted to them.  *See, e.g.*, Carver Dep. 123:7-25 (negative performance reviews would result from failure to spend budget); Hoffmann Dep. 126:21-127:5 (expected to utilize all the money allocated for promotional activities, not rewarded for saving the company money by spending less, no input on budget amount).  Whether these responsibilities constitute independent discretion and judgment with matters of significance is a question not currently before the Court, but it is one that can be answered uniformly with respect to the proposed collective action.

[21] *See, e.g.*, D'Amato Dep. 57:11-58:21, 59:11-60:10; Ramirez Dep. 52:9-24; Stallone Dep. 103:7-25; Purnell Dep. 112:3-22.

**8.      PSRs Are Subject to Similar Supervision Structures.**

The evidence demonstrates that PSRs are subject to two kinds of supervision by their direct managers.  On a day to day basis, PSRs are required to log the details of their daily activities into Boehringer's computer systems, which their managers then access and use to monitor their PSRs' use of time and progress towards their goals.  *See supra* n.8.  In addition to this daily supervision, PSRs are directly observed by their District Managers through one or two day ride-alongs on a monthly basis.  *Ruggeri II*, 585 F. Supp. 2d at 260.  During the ride-along the District Manager accompanies the PSR as she conducts her job duties throughout the day, and then critiques the performance of those job duties against Boehringer's expectations.[22] Defendant concedes that this is the structure of PSR supervision, but points to variance in the individual practices of certain managers – that some were more interested in micromanaging their PSRs than others.  Def.'s Opp. at 19-21.[23]  The management style of individual managers, as argued in more detail below, does not render PSRs dissimilarly situated because all PSRs share a general structure of supervision.

**III.     ARGUMENT**

> **A.  Collective Action Certification is Appropriate Under Any Applicable Standard: The Precise Nature of Plaintiffs' Burden Is Irrelevant**

Defendant contends that, although Plaintiffs' motion merely sought preliminary certification of the collective action and court-facilitated *Hoffman-LaRoche* notice, a "heightened standard" of proof should apply to the motion because of the extensive discovery in *Ruggeri*.  As discussed in Plaintiffs' opening memorandum, Plaintiffs believe the lenient notice-stage standard should apply, but it does not matter what standard of proof the court applies:  Plaintiffs' motion should be granted because the evidence in favor of collective action treatment is overwhelming.

> **B.  Even Under a Heightened Standard, Plaintiffs Only Need to Demonstrate Similar, Not Identical, Job Duties and Legal Claims**

If the Court chooses to apply a second stage analysis to Plaintiffs' preliminary certification motion, it applies a "higher standard" (or less lenient standard) than the standard

---

[22] *See, e.g.*,  Summers Dep. 100:16-101:4; Ramirez Dep. 19:16-19, 161:20-162:5; McKenzie Dep. 67:20-68:6; Stallone Dep. 95:12-14; Purnell Dep. 139:19-141:4.

[23] *See*  Smith Dep. 144:23-145:2.

typically applied at this stage of the case. *Moss v. Crawford & Co.,* 201 F.R.D. 398 (W.D. Pa. 2000); *see also Ayers v. SGS Control Services, Inc.*, 2007 WL 646326, *4 (S.D.N.Y. Feb. 27, 2007) ("[t]he second stage is usually precipitated by a defendant's motion for decertification of the class, and involves 'a higher standard' in analyzing the 'similarly situated' issue"). Moreover, while the second stage "similarly situated" analysis is less lenient than the standard applied at the notice stage, the 'similarly situated' requirement of 29 U.S.C. § 216(b) is "considerably less stringent than the requirement of Fed.R.Civ.P. 23(b)(3) that common questions 'predominate.'" *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 481 (E.D.N.Y. 2001).

The FLSA's "similarly situated" standard requires courts to determine whether employees are similarly situated -- not whether their positions are identical. *Scott v. Aetna Services, Inc.* 210 F.R.D. 261, 265 (D.Conn. 2002) (refusing to decertify collective action despite evidence of differences in job duties); *see also Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.1996) ("[p]laintiffs need show only that their positions are similar, not identical"); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 -1262 (11th Cir., 2008) (FLSA does not require potential members to hold identical positions); *see also Moss v. Crawford & Co.,* 201 F.R.D. 398 (W.D.Pa. 2000) (differences in job duties, geographic assignments, and hourly billing rates did not defeat certification). This standard is analogous to the "typicality" requirement of Rule 23(a)(3), which has been permissively interpreted in like fashion to require only that the named plaintiffs' claims and defenses be "*reasonably co-extensive* with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (emphasis added).

In determining whether putative collective action members are "similarly situated," courts review several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff;[24] [and] (3) fairness and procedural considerations." *Thiessen v. General Electric Captial Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001); *see also Torres v. Gristede's Op. Corp.*, 2006 WL 2819730, at *9 (Sept. 29, 2006, S.D.N.Y.); *see also Ayers*, 2007 WL 646326, at *5. In making this determination, the Court's focus is on whether plaintiffs are sufficiently similar, and not on the merits of whether those arrangements violate the FLSA. *See*

---

[24] Though "even individualized defenses can be managed and do not make the opt-in class unmanageable." *Moss*, 201 F.R.D. at 410; *see also Torres*, 2006 WL 2819730, at *11 (*citing Moss*).

*Thiessen*, 267 F.3d at 1106-07 (reversing decertification because district court made merits determinations in the guise of deciding whether plaintiffs were similarly situated); *see also Nerland v. Caribou Coffee Co., Inc.*, 564 F.Supp.2d 1010, 1019 (D. Minn. 2007).

In applying the heightened standard, it is important to consider that under the FLSA employees are entitled to overtime compensation for time worked in excess of 40 hours per week, unless they fall under one of the narrow statutory exemptions. *See* 29 U.S.C. §§ 207, 213. The burden of proving whether or not an exemption applies rests on the Defendant, and exemptions are "narrowly construed against employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit." *Bothell v. Phase Metrics*, 299 F.3d 1120, 1124-25 (9th Cir. 2002) (internal quotes and alterations omitted); *see also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) (same); *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2nd Cir. 2002).

Plaintiffs allege that they, and similarly situated PSRs, have been illegally deprived of overtime compensation for time worked in excess of forty hours per week because of Boehringer's uniform policy and practice to classify PSRs as exempt from the FLSA's overtime requirements on the basis of the job titles and without regard to their individual circumstances. Because Plaintiffs and the potential opt-in members share nearly identical job duties and employment settings, the collective action members are similarly situated with respect to the FLSA, and this case should be maintained as a collective action.

### C. Plaintiff Copello Can Represent the Proposed Collective Action.

Defendant's argument that Copello cannot represent a "class" because she signed a "class action waiver" fails for several reasons: since Plaintiffs' Motion seeks to conditionally certify a § 216(b) collective action, not a class action, the waiver provision is inapplicable; and, the waiver is both procedurally and substantively unconscionable and void as against public policy.

### 1. The Plain Language of the Waiver Does Not Preclude Participation in a FLSA Collective Action.

Plaintiffs have filed a motion to conditionally certify a § 216(b) FLSA collective action, not a class action under Rule 23. Section 216(b) FLSA collective actions and Rule 23 class actions are different. Defendant's interpretation of the word "class" as meaning "collective action" contradicts cases holding that Rule 23 class actions are not the same as FLSA collective actions: whereas a class action allows a representative plaintiff to represent the interests of absent

class members, a collective action requires that all similarly situated collective action participants actively opt-in to the lawsuit.  Since the terms "class action" and "collective action" have different meanings, it is not proper to undermine the plain language of the contract (which uses the term "class"). *See Sparveri v. Town of Rocky Hill*, 656 F.Supp.2d 297, 309 (D. Conn. 2009). To interpret the term "class" to mean the same as "collective," would "torture words to impart an ambiguity where the ordinary meaning of the words leaves no room for ambiguity." *Id.*

Here, the purported waiver states that the employee "waives and gives up any right to become, and promises not to consent to become, a member of any *class* in a case in which claims are asserted against the Company that are related in any way to Employee's employment or the termination of Employee's employment with the Company."   There is no class here: only a potential group of similarly situated individuals who may choose to opt in to this case.  In fact the release does not purport to waive, or even mention, FLSA claims despite explicitly including other statutory claims. Thus it is only reasonable to interpret the waiver as speaking to being a member of a Rule 23 class, not the instant "collective action" under § 216(b). Hence, under the Release's plain language, Defendant's waiver argument lacks merit.

Case law bears this interpretation out:  many courts have distinguished class actions from collective actions.  A proceeding under § 216(b) does not constitute a "class action," because, among other reasons, the standards for certifying a collective action are quite different from those required for a Rule 23 class action.  *See, e.g.*, *Church v. Consolidated Freightways, Inc.*, 137 F.R.D. 294 (N.D. Cal. 1991).  That some courts have casually referred to § 216(b) as a class action does not alter this conclusion. *Chapman v. Lehman Brothers, Inc.*, 279 F.Supp.2d 1286, 1289 (S.D. Fla. 2003) (court refused to indulge an expansive reading "class actions" to include "collective actions").  The Defendant's reliance on *Pomposi v. Gamestop, Inc.*, 2010 U.S. Dist. LEXIS 1819 (D. Conn. January 11, 2010), is misplaced. Unlike in this case, the *Pomposi* waiver specifically stated that the plaintiff waived the right to participate in "collective actions," not just class actions. *Id*. at *7. The specific waiver language involving "collective actions" in *Pomposi* is absent here. If Defendant intended for Copello to waive her right to participate in a collective action, it should have included such language in the Release.

> **a. The Defendant's Expansive Interpretation Should Be Rejected Because the Release Does Not Waive FLSA Claims.**

Although the Release contains a long list of released claims, it does not include FLSA claims. According to contract law principles, having failed to include the waiver of FLSA overtime claims, Defendant's "class" language does not, on its face, encompass FLSA claims. *See Carona v. Illinois C.G.R. Co.*, 561 N.E. 2d 239, 242 (5th Dist. Ill. App. 1990) ("where a release contains words of general release in addition to recitals of specific claims, the words of general release are limited to the particular claim to which reference is made."). Since the class waiver provision immediately follows the list of released claims, but is not itself included in the list, the plain reading of the Release excludes FLSA as well as other collective action claims. A reasonable lay person reading the Release, which does not encompass FLSA claims, would not reasonably expect that by signing the Release, she waived her right to collective action rights involving FLSA claims. The Defendant's argument that the waiver also encompasses a collective action waiver conflicts with the Release's plain language, and no ambiguity exists in that contract language.

If the Court decides that the Release's language is ambiguous, where an ambiguity exists in a contract, the rule of *contra preferentum* requires that a contract be construed against the party who drafted it. *See Connecticut Ins. Guar. Assoc. v. Drown*, 2010 Conn. Super. LEXIS 2551, *21 (October 14, 2010); *accord International Miners & Chemical Corp. v. Liberty Mut. Ins. Co.*, 522 N.E.2d 758, 764 (1st Dist. Ill. App. 1988). Since Defendant drafted the Release and is arguing for an interpretation other than that of the contract's plain language which does not encompass FLSA collective actions, and given the disparity in the degree of sophistication of the parties, the contract should be construed against Defendant.

### 2. The Waiver Is Procedurally and Substantively Unconscionable

Wholly apart from the Release being, on its face, inapplicable to this Motion to conditionally certify a FLSA collective action for overtime violations, the Release is both procedurally and substantively unconscionable.

### a. The "Class Action" Language is Obscure and Buried Within the Release

The "class action" language is procedurally unconscionable because it is buried in the Release's fine print. Unlike *Pomposi*, where the class action language was in all capital letters and clearly included additional language specifying that the parties agreed to waive "class, collective or representative actions," here the "class action" language is buried at the bottom of

the fourth page of a nine page Release. It is not bullet pointed, as are the other claims being released; it is not printed in all capital letters; and it is not printed in a bold or other distinctive typeface. Nor is there any separate heading alerting Ms. Copello to the language. Even if Ms. Copello was aware of the Defendant's intended breadth of the language, the obscure and hidden language was unconscionable.

### b. The "Class Action" Language Violates Public Policy

It is well settled that "FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728, 740 (1981). FLSA rights cannot be waived without prior DOL or court approval. *See Taylor v. Progress Energy, Inc.*, 493 F.3d 454 (4th Cir. 2007) (citing *Barrentine*, 450 U.S. at 740, 745). Defendant concedes that Ms. Copello has not waived her individual FLSA claim.

Defendant nevertheless contends that despite this well-settled law, Ms. Copello has waived the right to participate in an FLSA collective action. The same policy reasons that prevent a contractual waiver of an individual FLSA claim, however, also prevent contractual waiver of the right to participate in, or be the representative of, a collective action. A plaintiff's FLSA rights are abridged when she cannot bring her claim on behalf of other similarly situated employees, because the size of her claim may not justify the expense and risk of litigation, including the exposure to potential retaliation. Moreover, the FLSA rights of employees as a group are abridged when the informational and cost-spreading mechanisms of collective action are denied.

The FLSA expressly provides that a plaintiff may maintain an action "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. §216(b). The right to maintain an action on behalf of employees similarly situated is thus part of the FLSA claim that Congress provided.[25] The ability to pursue a collective action is integral to the employee's substantive rights under the FLSA. First, the cost of litigating the individual claim relative to the size of the potential recovery is likely to dissuade individual

---

[25] This fact distinguishes this case from those cited by Defendant in which the plaintiffs seek to enforce rights other than those created under a statutory scheme like FLSA in which collective action is so integral to enforcement of the substantive right. *See, e.g.*, *O'Quinn v. Comcast Corp.*, 2010 WL 4932665 (N.D. Ill. 2010) (consumer action under state false advertising law).

plaintiffs from pursuing meritorious claims. *Cf. Gentry v. Superior Court*, 165 P.3d 556 (Cal. 2008) (applying California law to find class action waivers in employment contracts "substantively unconscionable inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."). This not only deprives employees of recovery, but also grants employers impunity to violate the labor protections established by Congress. Second, employees litigating claims individually are at greater risk of retaliation than those acting collectively. *Cf. Gentry*, 165 P.3d at 565-66; *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 625 (5th Cir. 1999). Third, some employees will be unaware that their legal rights are being violated unless informed through a collective action notice. *Cf. Gentry*, 165 P.3d at 566; *Muhammad v. County Bank of Rehoboth Beach*, 912 A.2d 88, 100 (N.J. 2006).

Thus, the right to bring an action on behalf of other similarly situated employees is an integral right provided under the FLSA, and cannot be contractually waived. To hold otherwise would be contrary to public policy. *Brown v. Soh*, 909 A.2d 43, 49 (Conn. 2006) (applying general principal that that "contracts that violate public policy are unenforceable" to conclude that exculpatory agreements in employment contracts are void as against Connecticut public policy based on state's interest in workplace protections and the employer's superior bargaining power).

### D. Plaintiff Allen Can Represent the Class

Defendant argues that Allen cannot represent the proposed collective because her FLSA claims are time-barred and duplicative of her FLSA claim pending in Connecticut. Opp. Br. at 23. Plaintiffs addressed these arguments in their opposition and surreply to Defendant's motion to dismiss Allen, Docs. 43, 50-1, and Defendant raises no new arguments or authority in its present opposition. Defendant's arguments lack merit because Allen's FLSA claim is timely and because the Court has discretion to allow facilitate efficient adjudication of Allen's claims by allowing Allen to pursue, in a single action, her FLSA claim and her Illinois claim arising out of the same facts.

### 1. Allen's FLSA claim is timely.

Allen is a suitable collective-action representative because her FLSA claim is not barred by the statute of limitations. First, Allen filed a Consent to Join form in the District of Connecticut, *Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, Case No. 06-1985, *see* Doc. 28-1 (First Am. Compl. Ex. 1), on November 12, 2008. Allen was employed by Defendant from October 2006 to February 2008; so her entire employment period is covered by the three-year statute of limitations applicable to willful violations of FLSA. 29 U.S.C. §255(a).[26] By filing that form, Allen put Defendant on notice of her FLSA claim, thereby serving the key purpose of a statute of limitations, which is to "ensure fairness to defendants . . . by preventing surprises through the revival of claims that have been allowed slumber until evidence has been lost." *Burnett v. New York Cent. Railroad Co*., 380 U.S. 424 (1965) (finding equitable tolling of statute of limitations appropriate where a state court action had been commenced within the limitations period, but the federal claim was not); *see also United States v. Kubrick*, 444 U.S. 111, 117 (1979) (purpose of limitations period is "to put the adversary on notice to defend within a specified period of time"). That purpose is served even where Plaintiff has put Defendant on notice of her intent to pursue her rights in a different forum. Defendant will suffer no prejudice in its defense of Allen's federal claims if she pursues them in Illinois. *See* Pltfs.' Opp. to Defendant's Motion to Dismiss Allen's Federal Claims, at 1-2, 5.

Even if the Court determines that Allen's FLSA claim in this case was filed only when she joined this action as a named plaintiff on January 18, 2011, Allen has a valid FLSA claim for part of her employment period because FLSA's three-year statute of limitations applies. *See id.* at 6-14. Allen has adequately pleaded facts showing that Defendant's violation of FLSA was willful under the standard set out in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The question of willfulness pertains to Defendant's state of mind, which can be averred generally under Federal Rule 9(b), so the Court should not impose a heightened pleading standard on Plaintiff, particularly since most of the relevant evidence is in Defendant's sole possession. Pltfs.' Opp. to Defendant's Motion to Dismiss at 6-7. In addition, Plaintiffs' complaint pleads specific facts, not conclusory legal allegations, regarding Defendant's willful violation, including that the Defendant "inaccurately classif[ied] [the covered employees] as exempt from overtime pay even though Defendant was aware that the Covered Employees were non-exempt and

---

[26] Even if the Court concludes that Allen can recover for only two years under §255, this still enables her to recover a significant majority of her unpaid overtime wages.

entitled to overtime pay." First Am. Compl. ¶33. The Complaint also alleges that Defendant's failure to pay overtime was willful because Defendant "knew, or should have known, of the requirements of FLSA." *Id.* ¶50. These allegations are sufficient under Federal Rule 8(a). *See* Pltfs.' Opp. to Defendant's Motion to Dismiss at 8-11.

### 2. Allen should be permitted to pursue an FLSA claim in this action.

Defendant's second challenge to Allen's suitability as a collective-action representative relates to her involvement in the FLSA action pending in *Ruggeri*. This argument presumes that this Court will find it appropriate to dismiss Allen's FLSA claim simply because it is duplicative of her opt-in claim in *Ruggeri*. In fact, as Plaintiffs explained in their surreply, this Court has "a great deal of latitude and discretion" in determining whether to dismiss Allen's opt-in claim as duplicative. *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221 (7th Cir. 1993) (quoting *Ridge Gold Standard Liquors v. Joseph E. Seagram*, 572 F. Supp. 1210, 1213 (N.D. Ill. 1983)). Before dismissing a suit as duplicative, "the district judge should consider any special factors counseling for or against the exercise of jurisdiction in the case before him," *Calvert Fire Ins. Co. v. Am. Mut. Reinsurance Co.*, 600 F.2d 1228, 1234 (7th Cir. 1979), including the degree to which dismissing an action will "unduly prejudice or tactically disadvantage the non-moving party," "simplify the issues in question and streamline the trial," and reduce the "burden of the litigation on the parties and on the court." *Pfizer Inc. v. Apotex Inc.*, 640 F.Supp.2d 1006, 1007 (N.D. Ill. 2009) (considering these factors in the context of motion to stay a duplicative proceeding).

Several factors counsel in favor of exercising jurisdiction over Allen's FLSA claim in this suit. First, although Allen has FLSA claims in both this Court and *Ruggeri*, she can pursue her Illinois law claims only here because the district court in *Ruggeri* declined to exercise supplemental jurisdiction over her state law claims. *See Ruggeri I*, at 5-8; *see also* Pltfs.' Opp. to Defendant's Motion to Dismiss at 2-3 n.1. Thus, for Allen to assert her rights under Illinois law, she had to file this separate action. Dismissing Allen's FLSA claims would require her to litigate her state and federal claims in separate actions. This is not merely inconvenient for Allen, but also makes her state law claim vulnerable to a subsequent challenge on the ground that she has split her federal and state claims arising from the same set of facts across two different actions.

If Allen is later barred from pursuing her state law claims, she will not be able to obtain full relief. The Illinois Minimum Wage Law provides for a three-year statute of limitations, (*see* 820 ILCS 105/12(a); Compl. ¶66), unlike the FLSA, which allows Allen to recover for three

years of underpayment of her wage only if she can show that Defendant's violation was willful.[27] Second, Illinois law provides for a two percent punitive damage award, (*see* 820 ILCS 105/12(a); Compl. ¶65), while no such damages are available under the FLSA. Thus dismissing her current claims will "unduly prejudice or tactically disadvantage the non-moving party." *Pfizer*, 640 F.Supp.2d at 1007.

Nor are there strong efficiency or fairness interests favoring dismissal of Allen's FLSA claim.[28] Dismissing Allen's FLSA claims will not "simplify the issues in question and streamline the trial," or in any way reduce the "burden of the litigation on the parties and on the court." *Pfizer*, 640 F. Supp. 2d at 1007. First, Defendant will be required to defend against the FLSA claims here regardless of whether Allen is a collective-action representative. Catherine Copello is a suitable collective action representative for the reasons set forth above, but even if the Court should decide that she cannot serve as a collective-action representative based on the release she signed, Copello's individual FLSA claim will go forward. Because the Court and trier of fact will have to address FLSA issues in this action no matter what, there is little work to be saved by eliminating Allen's FLSA claim.

Moreover, even if Allen does not represent the FLSA collective action, she can still be a class representative for the Illinois claims, over which this Court would have jurisdiction based on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *See* First Am. Compl. ¶12. In short, this Court will likely have jurisdiction over a state law class action for unpaid overtime wages involving nearly identical issues and represented by Plaintiff Allen. No efficiency gains or reduced burden on the Defendant are realized by concluding that Allen is not an appropriate collective-action representative for a nearly identical FLSA collective action.

The Court has discretion to conclude that principles of "wise judicial administration" do not require dismissal of Allen's FLSA claim where dismissal would possibly prevent Allen from pursuing her state law claims, and would not ease the burden on the Court or Defendant.

---

[27] As argued above, Allen has adequately alleged for the purposes of Rule 8(a) that Defendant's violation of FLSA was willful, and will present evidence of this fact following discovery.

[28] Unlike a situation where the plaintiff on her own initiative files duplicative actions, Allen has not independently invoked the judicial machinery in a way that is inefficient for the courts, or burdensome or harassing to Defendant. In this way, Allen's decision to opt in to the *Ruggeri* action is fundamentally different from the conduct of a plaintiff who initiates multiple actions against the same defendant.

Consequently, the duplicative nature of Allen's FLSA claim does not disqualify her to represent the members of this FLSA collective action.

### E. Defendant's Administrative Exemption Defense Can Be Tried on a Collective Basis.

There is no merit to Defendant's argument that cases may not be tried as collective actions where the employer asserts an administrative exemption defense. Def.'s Opp. at 27-28. To the contrary, many courts, including one of the few appellate courts to consider the issue, have rejected this very argument. *See, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008) (affirming district court's denial of decertification in executive exemption case, despite the fact that the executive exemption defense is "individualized and fact specific"); *Scott v. Aetna Services, Inc.*, 210 F.R.D. 261, 264-65 (D. Conn. 2002) (denying decertification even though exemption determination is "necessarily fact intensive"). For this reason, the *Ruggeri* court has already rejected Defendant's argument. Exh. 1 at 14.[29] So long as the plaintiff employees have similar job duties—as plaintiffs have established here—a misclassification case may be tried as a collective action. *See, e.g., Morgan*, 551 F.3d at 1263; *Scott*, 210 F.R.D. at 264-65; *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (denying decertification in administrative exemption misclassification case where the evidence demonstrated that duties of opt-in plaintiffs were not "substantially distinct"); *Bradford v. BedBath & Beyond, Inc.*, 184 F. Supp.2d 1342, 1346, 1351 (N.D. Ga. 2002) (denying decertification in executive exemption misclassification case after finding that job duties of plaintiffs were "substantially similar" in light of the "key considerations" of the exemption).

Defendant's cases to the contrary are distinguishable because they present factual scenarios where the job duties of potential opt-ins varied widely. For example, in *Pfohl v. Farmers Ins. Group*, 2004 WL 554834 (Mar. 1, 2004, C.D. Cal.), the proposed collective action consisted of contractors who were directly employed by several different companies and whom had wide-ranging authorities within those companies; some, for instance, had the power to hire and fire, some did not and it was unclear who was properly considered an employee of the defendant. *Id.* at *3-4. Similarly, in *Holt v. Rite Aid Corp.* 333 F. Supp. 2d 1265, 1274 (M.D.

---

[29] In the context of granting Plaintiffs' Motion for Conditional Collective Action Certification, the *Ruggeri* Court stated "[t]he defendant's assertion that FLSA claims are too individualized to be suitable for conditional certification and notification is unconvincing." Exh. 1 at 14.

Ala. 2004), the court found that there was "substantial evidence" showing that potential collective action members spent different amounts of time performing exempt and non-exempt tasks, therefore making it necessary to analyze the administrative exemption on a case-by-case basis, whereas here the evidence shows that PSRs spend the vast majority of their time doing the same thing: presenting information to doctors and tasks necessary to get this core job done.

Defendant's other authorities also should not be followed by this Court. *Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161 (Apr. 22, 2008, S.D. Cal.) involved a case not where the court concluded that an administrative exemption defense prevented collective action certification, but instead a case where plaintiffs failed to submit creditable evidence, instead choosing to rely on "boilerplate and legal conclusions." *Id.* at *3. As Defendant concedes, this is certainly not the situation here. Finally, *Evancho v. Sanofi-Aventis, U.S., Inc.*, 2007 WL 4546100 (Dec. 19, 2007, D. N.J.), an unpublished decision from the district of New Jersey, is unpersuasive and distinguishable. The *Evancho* court denied preliminary certification of a proposed collective action of PSRs at Sanofi-Aventis on the basis of a handful of written declarations that purportedly demonstrated differences relevant to the administrative exemption. By contrast, the record here is much more robust, and the testimony discussed at length plainly shows that PSRs perform the same job duties, pursuant to the same procedures and rules. Because, as discussed above, courts routinely hold that collective actions are warranted when the potential opt-in members have *similar*, not identical, job duties, *Evancho* is not persuasive authority and should not be followed by this court.

### F. Plaintiffs and the Opt-in Participants Are Similarly Situated With Respect to their Status Under the FLSA.

Because all PSRs share the same core job duties, exercise the same level of discretion in performing those duties, are subject to Boehringer nation-wide rules, and have been uniformly classified as exempt by Boehringer without regard to individual circumstance, they are similarly situated for purposes of their FLSA claims.

### 1. Legal Questions Pertaining to the PSRs' Status Under the FLSA Are Common to the Class.

Employees who work in a "bona fide administrative capacity" are exempt from the overtime requirements of the FLSA. 29 U.S.C. §213(a)(1). Under Department of Labor regulations, in order to be employed in a bona fide administrative capacity an employee must be

(1) compensated on a salary or fee basis at not less than $455 per week; (2) perform a primary job duty that is directly related to the management or general business operations of the employer or the employer's customers; and, (3) perform a primary job duty that includes the exercise of independent judgment and discretion with respect to matters of significance. 29 C.F.R. § 541.200. Defendant bears the burden of proving each prong of the exemption, and whether the PSR job at Boehringer meets these criteria is a question that can be answered uniformly for all PSRs.[30]

## 2. All PSRs Are Compensated on a Salary Basis of at Least $455 per Week.

Plaintiffs and the opt-ins all earned a base salary in excess of $455 per week (which amounts to a $23,660 annual salary). Accordingly, Plaintiffs and the opt-in participants are similarly situated with respect to the first prong of the administrative exemption and this issue can be adjudicated on a collective-action wide basis.

## 3. All PSRs Share a Common Primary Job Duty.

The second and third prongs of the administrative exemption both rest, in part, on a factual determination of the employee's "primary duty." 29 C.F.R. § 541.200. An employee's primary duty is "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). In this case, the fact finder will be able to determine the "primary duty" of all PSRs on the basis of representative evidence because, regardless of job title, level, geographic

---

[30] Defendant asserts that some opt-in members, for some periods of relevant time, made in excess of $100,000 and are subject to a slightly lower exemption standard applicable only to "highly compensated" employees. Defendant has not provided any evidence showing which opt-in members it claims are subject to this standard, nor for what years. In fact, the Evancho Declaration cited by Defendant has not been filed in this case. Plaintiffs do not concede that Defendant has a) carried its burden to show that the highly compensated employee standards apply to any individuals, b) that even if these standards did apply that the individuals subject to them are properly classified as exempt, or c) that the highly compensated employee exemption is itself a valid and enforceable exercise of the Department of Labor's regulatory authority. Nonetheless, if the Court is concerned that slightly different legal issues might pertain to these individuals, that can be readily managed through a sub-class. *See* In re *Delta Air* Lines, 310 F.3d 953, 956 (6th Cir. 2002); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1352 (N.D. Ga. 2002); *Roman v. Korson*, 152 F.R.D. 101, 109 (W.D. Mich. 1993).

location or individual circumstance, PSRs performed the same set of core job duties, including, among other things: presenting approved information to physicians, driving to physician offices, interfacing with front-office staff to determine physician availability, distributing product samples and managing sample inventories, reviewing product information, and entering data into Boehringer's computer systems. *Supra* at nn.5-12.

Contrary to Defendant's claim, variance in the details of how specific job duties are performed does not render employees dissimilarly situated for purposes of the FLSA. For instance, in *Morgan v. Family Dollar Stores, Inc.*, the Eleventh Circuit upheld the district court's denial of decertification of a collective action consisting of 1,424 store managers across the country where the employees in question, like here, worked under nearly identical job descriptions, spent their time performing similar tasks, and were governed by the same uniform policies and rules. 551 F.3d at 1245-47, 1262-63. This was despite evidence that because of variations in geographic location and store size, different class members spent their time in different ways on a day-to-day basis. *Id.* at 1245, 1263. Likewise, in *Scott v. Aetna Services, Inc.*, the court declined to decertify a FLSA collective action despite evidence showing that each member of the collective action worked on "different specific assignments;" finding that their job duties were nonetheless of the same general type. 210 F.R.D. at 265. Here, the variations in job duties, even taking Defendant's factual assertions as true, are far less substantial or pervasive than either of those cases. Defendant's claim that because some PSRs are assigned to primary care physicians, and others primarily to specialist physicians, or its allegation that some PSRs occasionally detailed pharmacies while others did not, does not render these PSRs dissimilarly situated because they their job duties with respect to all these different assignments were of the same type: presenting approved information about Boehringer's products within parameters required by the company. Therefore, the primary duty analysis under the administrative exemption can be conducted on a class wide basis.

## G. Plaintiffs' Proposed Notice Is Proper

Defendant raises five objections to Plaintiffs' proposed form of notice to the potential opt-in plaintiffs. First, Defendant contends that Plaintiffs "cannot possibly" establish that Defendant's classification of PSRs as exempt from the FLSA's overtime requirement was willful. As an initial matter, this argument is premature and the willfulness issue should not be decided at this stage of the case. Additionally, Defendant's argument that it could not possibly

have willfully violated the FLSA because some out-of-circuit rulings have held PSRs at different companies are exempt is without merit. Not only do these cases post-date Defendant's classification decision, Defendant does not mention that the Second Circuit Court of Appeals – the court overseeing Defendant's home district – held precisely the opposite. *See In re Novartis Wage and Hour Litigation*, 611 F.3d 141 (2d Cir. 2010).

As for Defendant's claim that putting the court caption on the proposed notice is improper, it suffices to say that many courts have rejected this argument, and that the court-authorized notice that went out in *Ruggeri* contained the case caption. *Adams v. Inter-Con Sec. Systems, Inc.*, 242 F.R.D. 530, 540 (N.D. Cal. 2007); *see also, Gieseke v. First Horizon Home Loan Corp.*, 2006 WL 2919076, *1 (D. Kan. Oct. 11, 2006); *Carlson v. Leprino Foods Co.*, No. 1:05-W-798 2006 WL 2375046, *1 (W.D. Mich. Aug. 15, 2006) ("The use of the caption is important so that readers will not confuse this notice with junk mail (which is unfortunately abundant)."); *Boyd v. Jupiter Aluminum Corp.*, No. 2:05-CV-227PPSAPR, 2006 WL 1518987, *6 (N.D. Ind. May 31, 2006) ("use of a case caption . . . does not suggest any judicial sponsorship of Plaintiffs' claims in the case. Even if it did, the effect of any such suggestion is cured by the disclaimer."). *Libront v. Columbus McKinnon Corp.*, 1984 U.S. Dist. LEXIS 21259, *4 (W.D.N.Y. Dec. 13, 1984), the only case Defendant cites, merely expresses the court's desire to avoid giving the impression that the notice was sent by or at the request of the court and does not hold that use of court captions on notices is inherently impermissible.

Finally, regarding Defendant's other objections, it offers no reason at all for why a 180 day opt-in period is "needlessly long," nor does it propose a shorter period. The claim that potential opt-ins should be informed of potential discovery obligations is transparently an attempt to intimidate the potential opt-ins, and courts have rejected the notion that opt-ins should be informed of their right to be represented by their own attorney. *See, e.g. Adams*, 242 F.R.D. at 541 ("Suggesting that a plaintiff may opt in and bring her own lawyer along would lead to confusion, inefficiency and cumbersome proceedings. . . [and] would make the lawsuit unwieldy, if not impracticable.").

### H. Equitable Tolling Is Warranted

Defendant deems Plaintiff's request for equitable tolling "silly" on the theory that because a list of potential opt-ins and addresses was produced to Plaintiff's counsel in the *Ruggeri* matter, that Plaintiffs could use this list to contact potential opt-ins and inform them of

the pendency of the lawsuit.  This argument is wrong for several reasons, including that the list in question was produced pursuant to a protective order that explicitly limits its use to the *Ruggeri* case, and because the composition of the proposed collective-action is not the same as it was in the *Ruggeri* case because of the different time periods covered by these actions.

Dated: <u>March 25, 2011</u>

Respectfully Submitted,

Plaintiffs,

By:<u>s/ Bethany Hilbert</u>

Marty Denis
Bethany Hilbert
Barlow, Kobata & Denis LLP
525 W. Monroe Street, Suite 2360
Chicago, Illinois 60661
(312) 648-5570

Michael Rubin
James M. Finberg
Eve H. Cervantez
Casey Roberts
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

Steven G. Zieff
David A. Lowe
John T. Mullan
Rudy, Exelrod, Zeiff & Lowe, LLP
351 California Street, Suite 700
San Francisco, CA 94101
(415) 434-9800

Todd F. Jackson
James Keenley
Lewis, Feinberg, Lee, Renaker & Jackson, P.C.
476 – 9th St.
Oakland, CA 94607
(510) 839-6824

*Attorneys for Plaintiffs Catherine Copello
and Annette Allen*